THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MAX BLANCK, Appellant.

First Department, May 1, 1925.

Crimes — trial — evidence — grand larceny, first degree — witness for prosecution testified that check was delivered on July tenth and another witness testified that she made bank deposit — admission by district attorney that check was delivered about June fifteenth and that another made bank deposit establishes said facts and evidence relating thereto cannot be considered — error for court to submit said questions to jury — arguments of counsel — prejudicial error for district attorney to ask defendant on cross-examination whether he committed manslaughter arising out of arson, where district attorney knew that defendant had been acquitted of charge.

On a prosecution for grand larceny in the first degree, the admission by the district attorney that a certain check was delivered by the defendant to the complaining witness about the fifteenth of June establishes that fact notwith-

standing one of the witnesses for the prosecution testified that the delivery was made on the tenth of July, and likewise an admission by the district attorney that a certain person made a bank deposit establishes that fact, although a witness for the prosecution had testified that another person made the deposit.

Those facts having been established by the admissions of the district attorney, it was error for the court to submit the questions to the jury. The court should have instructed the jury that the admissions by the district attorney were conclusive on the prosecution.

It was prejudicial error for the district attorney on the cross-examination of the defendant to ask him if he had not committed the crime of manslaughter upon named persons, which crime arose out of the crime of arson, where it appears that the district attorney knew at the time he asked the question that the defendant had been acquitted of the charge.

APPEAL by the defendant, Max Blanck, from a judgment of the Court of General Sessions of the Peace in and for the County of New York, rendered on the 18th day of December, 1923, convicting him of the crime of grand larceny in the first degree, and committing him to the New York County Penitentiary on an indefinite sentence, the time of his discharge to be fixed by the Parole Commission.

*George Wolf* [*Robert S. Johnstone* of counsel; *Stanley L. Richter* with him on the brief], for the appellant.

*Joab H. Banton, District Attorney* [*Felix C. Benvenga* of counsel; *Charles Henry* with him on the brief], for the respondent.

DOWLING, J.:

The defendant was convicted of the crime of grand larceny in the first degree under the second count of the indictment against him, which was thus epitomized in the charge of the learned trial court to the jury: " The second count in the indictment, which is the one I shall submit to you, alleges that on the 10th day of June in the year 1922, in this county, the defendant was agent and trustee of Emil and Julius Stern, copartners, doing business under the firm name of Stern & Stern, that as such agent and trustee he had in his possession, custody and control certain property of the said copartners, to-wit, the sum of $1,762.67, lawful money of the United States, and that having it in such possession he did feloniously appropriate said property to his own use, with intent to deprive and defraud said copartners of their property. That is the charge made against this defendant: That he, being the agent and trustee of the said Stern & Stern, had in his possession certain property of theirs amounting to 1,760 odd dollars and misappropriated it to his own use, intending to deprive and defraud Stern & Stern of their property."

It is unnecessary to discuss at length the testimony generally upon which the verdict of guilty was arrived at, as the question presented for our consideration does not involve the propriety of

that verdict, but resolves itself into certain alleged errors committed by the trial court.

The principal witness for the prosecution was James A. Stack, credit manager for the firm of Stern & Stern, dealers in textiles. It was the contention of the People that defendant had applied on May 19, 1922, to Stack for a case of merchandise from his employers "on credit," he then owing them $34,510.28, represented by outstanding notes. Stack declined to give defendant further credit unless his firm was protected, and said defendant must assign one of his outstanding accounts before he could get the goods. Defendant said he could assign an account of his against Oppenheim, Collins & Co. amounting to $2,770, and did in fact assign the account, which was payable in ten days from May 22, 1922, and sent the written assignment to Stack for Stern & Stern, and thereupon he received delivery of $3,000 worth of merchandise. Stack testifies that defendant told him the account would be due June tenth, and that he called up the latter on the telephone personally every day from June tenth on and was told the check from Oppenheim, Collins & Co. had not arrived. He then testified: " Q. Did you call them on July 10th? A. On July 10th, I did. Q. What was said then? A. At that time he said the check had gone through and he would send me down his check to take the place of it in payment of those bills. Q. When did he say he would send it? A. That day. Q. Was the check presented to you? A. A check was brought down to me by Miss Feehan at that time. Q. I show you this check and ask you if this was a check that was brought down to you on the 10th of July, 1922? A. It was. Q. Did Miss Feehan say anything to you when she brought this check in? Mr. Wolf: I object. The Court: What she said is incompetent. Q. Did she say anything to you? A. Yes. Q. Did you immediately deposit this check in your bank? A. I did not. Q. Did you have a conversation with this defendant about this check after that? A. After that, yes. Q. When did you talk to the defendant about this check? A. The end of July. Q. What was said then? A. I told him the check had come back uncollected funds. Q. Well, prior to that. Did he say anything to you over the telephone? A. He said he would send me down a check and asked me would I hold it for a few days. Q. You did hold it for a few days? A. I held it for a few days. Q. When did you deposit it? A. July 28th."

The defendant's check for $2,932.71 to the order of Stern & Stern, dated July 10, 1922, was offered in evidence.

On cross-examination he was asked: " Q. Did not he send you a check, this particular check dated July 10th and marked People's Exhibit 2, long before July 10th? A. He did not."

The People's witness, Mrs. Sadie Rohrmann (*née* Feehan), formerly a bookkeeper for defendant, was forced on cross-examination to admit that the check of July tenth was a post-dated check, given in June, and that there was no question about it. From an examination of entries in the defendant's books kept by her, the date was fixed as June twelfth or fifteenth. The assistant district attorney referred during her examination to this as a most important point, and it may truly be so termed, for the defendant's contention was that on June fourth or fifth he had a conversation with Stack at which he informed him that he had received his check from Oppenheim, Collins & Co. (it was in fact dated June third) and was going to use some of the money to buy laces and pay labor, to which Stack replied: " That will be all right." He also said he would like to clean up his indebtedness to Stern & Stern. Two days later they met again at lunch and the following occurred: " Q. Go on, tell us the talk. A. At the dinner table he [Stack] said, ' Well, it is satisfactory to the firm. We will settle the entire account, but with only one understanding, that you give us the notes of the Normandie Brand, Inc.' I said, ' That will be all right.' He said, ' Now, what is your proposition? ' I said to him, ' My proposition is to have time of about four to five years in which to pay up. I will make the first payments smaller and gradually increase them until business will improve until I have the entire amount paid up.' He said, ' That is all right. That is accepted.' "

Stack showed him a statement of all the amounts due to that date from the Normandie Waist Company and the Normandie Brand. It amounted to $33,000 or $34,000. The statement included the amounts of the invoices of May nineteenth, May twenty-second and May twenty-fifth, which were those in connection with which the Oppenheim-Collins assignment had been given.

The defendant then told Stack he would go back and check up with his bookkeeper and make up the notes for the amount of the indebtedness. He did so. The notes were at first prepared for about $34,000, the total amount of the indebtedness. He testified: " Q. Did you hear from Mr. Stack again? A. I did, the following day or it was the following Monday, just a day or two — the next day. He told me, ' Mr. Blanck, I would like you to make out a check for the amount of the last note, so that there will be some cash represented in the settlement.' I said to him that I could not give him any money because I need the money in the business and it will not be convenient. He said, ' Well, it makes no difference. If you will give it to me for a few days later.' I said to him, ' I will look it up and see,' for all that I can give it to him. When I

came back and I looked up how we are situated with money and how much money is coming in I told the young lady to make out a check for those bills, deducting the amount of the return of nine hundred and some forty dollars, and I believe some small bill of forty odd dollars, and make out a check for the balance, whatever the amount was, $2,900, and dated it as of July 10. She made out the check and she made out the notes — Q. And took. A. She showed me those and I signed the check and I signed the notes and I sent them down with the check and the notes in an envelope to deliver to Mr. Stack."

The date of the actual delivery of the check of July tenth thus became one of the most important elements in the case, if not the most vital, as a test of which version of the agreement or circumstances under which it was delivered, and as a further test of defendant's good faith in the matter.

Although Stack, the principal witness for the prosecution, had sworn positively that the check was brought to him on July tenth by defendant's bookkeeper, Miss Feehan, pursuant to a telephone conversation had by him with defendant, yet when the said bookkeeper admitted on cross-examination that the check was delivered on either June twelfth or fifteenth and was confirmed in that statement by examination of the books, the assistant district attorney made a concession of record in open court, following the following colloquy: " Q. Does not that item of $2,932.71 appear between several other items? A. Yes, sir. Q. Does it? A. Yes, sir. Q. Will you read the item of that $2,932.71 check, please? Mr. Panger: I object, if your Honor please, reading from a document not in evidence. The Court: Objection sustained. Mr. Wolf: I will offer it in evidence, if your Honor please. Mr. Panger: I object to it. The Court: What is it shown for? Merely to fix the date? Mr. Wolf: Yes. The Court: She has already testified to the date. Mr. Wolf: I want to show that in every book in which that amount is mentioned it shows that check was given between the 12th and the 15th. Mr. Panger: I will concede that this witness brought the check and the notes up at the same time, about when? The Witness: Around June 15. Mr. Panger: Around June 15. Mr. Wolf: I withdraw the offer of that book." We thus have an absolute concession of the prosecutor that Stack's testimony as to when he received the check was false, and that of the witness Mrs. Rohrmann was true.

The same criticism applies to a subsidiary and comparatively unimportant point, save as a test of accuracy or credibility. After Mrs. Rohrmann had testified that she personally deposited the Oppenheim, Collins & Co. check in the bank under the instructions

of defendant, Ned Blanck, defendant's son, on the other hand testified that it was he who deposited this check in his father's bank account, and not the bookkeeper. He was cross-examined at length on this point by the assistant district attorney and then the following occurred: " The Court: That is all. Mr. Wolf: May I put the representative of the bank on the stand, if your Honor please, and then recall Ned Blanck? The Court: Yes. Mr. Panger: I will concede that Ned Blanck made this particular deposit. Mr. Wolf: May I offer this in evidence? Mr. Panger: Yes. The Court: You say Miss Feehan was mistaken in saying she deposited it? Mr. Panger: Yes. (Paper received in evidence and marked Defendant's Exhibit J.) Mr. Wolf: I will submit on the record — I want to withdraw this exhibit by consent and I want to put on the record the deposit slip in the handwriting of Ned Blanck, in which it shows deposited by Normandie Brand, Inc., in the Chatham and Phenix National Bank, New York, June 3, 1922, one check, $80.06, another check $1,762.67, total, $1,842.73. It is so conceded."

We thus have an absolute concession by the prosecutor that the facts were otherwise than as testified to by his two chief witnesses.

Despite these concessions the learned trial court charged in part as follows: " In that connection, however, it is only fair to call your attention to the fact that the District Attorney conceded on the record that this check for repayment — the one that was dishonored — was taken down to Mr. Stack on June 15th, which concession, of course, contradicts Stack's statement that he did not know of the check and that he was calling up continually during that month to find out whether the Oppenheim, Collins bill had been paid or not. When Stack later took the stand he reiterated the fact that he did not see this check prior to July 10th. He said that when he agreed not to deposit it he had not seen the check before the date it bore date, and he agreed merely to hold it from the date it bore date until the 28th, and not for nearly a month prior to the day that it bore date. You must take that concession into consideration as much as any other sworn evidence in the case in determining whether or not the receipt of this money was concealed for a month from the complaining witness by the defendant."

At the close of the charge of the learned trial court the following occurred: " Mr. Wolf: I except to that portion of your Honor's charge in which your Honor charges that Mr. Panger's concession of the fact that these notes and check were delivered between June 13th or [and] June 15th may be taken in place of sworn testimony and I ask your Honor — The Court: I did not so charge. Mr. Wolf: As sworn testimony, and I ask your Honor to charge the jury

that Mr. Panger's concession of the fact that the notes and the check were delivered to Mr. Stack between June 13th and June 15th makes that fact, to wit, the fact that the check and the notes were delivered June 13th and June 15th an absolute and unrefutable fact, and they must disregard Mr. Stack's testimony as to when those notes and check were given. The Court: I refuse so to charge. It is not the province of the Court to tell the jury they must disbelieve any one witness. Mr. Wolf: I ask your Honor to charge the jury that Mr. Panger's concession as to when the notes and check were delivered dispenses with proof as to that fact and makes that fact an absolute fact. The Court: If there has been no proof in the case that certainly would be true, but I am not going to charge them that they must disbelieve any one witness. Mr. Wolf: I ask your Honor to charge the jury that Mr. Panger interrupted proof adduced on behalf of the defendant as to the fact that the check and the notes were delivered between June 13th and June 15th and then conceded that it was a fact that the notes and check were delivered between June 13th and June 15th. The Court: That is my recollection of what happened. The jury are bound by their own recollection, not mine. Mr. Wolf: I ask your Honor to charge the jury that had not this concession been made the defendant would have the right to produce more testimony and more evidence showing that was the fact. The Court: Yes, I so charge."

The learned counsel for the People cannot cite any case as authority for the proposition that because there had been testimony to the contrary previously given by their witnesses, a concession of a fact made in open court does not end any controversy as to the fact so conceded, but simply is one of the elements to be considered by the jury in determining the fact.

In *People* v. *Cannon* (139 N. Y. 645, 648) it was said: " Where both parties to a criminal action, the People and the defendant, have through their respective counsel stipulated in writing as to the existence of certain facts, and have embodied such facts in a written statement which has been put in evidence, each party has the right to claim that the jury ought to be bound by those facts so far as they go, and the court is entirely justified in so instructing the jury." And in *People* v. *Walker* (198 N. Y. 329) it was said (at p. 335): " It should be observed, however, that when a fact, even of great importance, is admitted by the defendant or his counsel in open court during the trial, that fact is established by the admission, and no evidence need be given in relation to it. Under such circumstances, the court might with propriety charge that the fact was established, but with this exception every con-

stituent part of the crime must be left to the jury, if a timely request is made to that effect."

As is said in Wigmore on Evidence:

§ 2588. " An express waiver, made in court or preparatory to trial, by the party or his attorney, conceding for the purposes of the trial the truth of some alleged fact, has the effect of a confessory pleading, in that the fact is thereafter to be taken for granted; so that the one party need offer no evidence to prove it, and the other is not allowed to disprove it. This is what is commonly termed a solemn — *i. e.*, ceremonial or formal — or judicial admission, and is, in truth, a substitute for evidence, in that it does away with the need for evidence.

" This judicial admission is sharply marked off from the ordinary or quasi-admission,— which indeed does not deserve to bear the same name. The latter is merely an item of evidence, available against the party on the same theory on which a self-contradiction is available against a witness. The distinctions between the two have already been examined (*ante*, §§ 1048, 1057). It is enough to note that, as to the effect, the latter is not conclusive; while as to its form, it may be either implied or express, and need not be either written or made in open court."

§ 2590. " The vital feature of a judicial admission is universally conceded to be its conclusiveness upon the party making it, *i. e.*, the prohibition of any further dispute of the fact by him, and of any use of evidence to disprove or contradict it."

In the case at bar we have concessions made solemnly in open court during the progress of a trial, having the effect of preventing any further effort by defendant to controvert the fact conceded, and intended so to do. When the concessions were made, regardless of what evidence was offered before, it became an established fact for all the purposes of the trial, (1) that the check of July tenth was a postdated one, which had been given to Stack on June twelfth or fifteenth; and (2) that defendant's son had deposited the check of Oppenheim, Collins & Co. and not his bookkeeper. The first was a vital question in the case and the refusal of the learned trial court to accept it as an established fact, and his submission of it as a controverted question to the jury, constitutes reversible error. The second was not a vital question, but it had a bearing on the weight to be given to the testimony of Mrs. Rohrmann.

Attention should also be called to improper conduct of the assistant district attorney during his cross-examination of defendant. The following occurred: " Q. Have you still got that factory in Staten Island? A. No, sir. Q. When did you close up that factory? A. That factory was destroyed by fire on November

last, 1923.   Q. Did you collect the insurance on that?   Mr. Wolf: I object to that and ask for the withdrawal of a juror by reason thereof.   The Court: Objection sustained.   If the factory burned down he has a right to collect insurance.   If there is anything further than that that is a different matter.   Mr. Panger: I beg your pardon.   The Court: As far as it appears he had a right if the factory burned down to collect insurance.   Mr. Panger: Yes, but we do not know whether he did or not.   May I talk to the Court privately a moment?   I want to know whether certain questions I intend —   The Court: I cannot advise the District Attorney —   Mr. Panger: I do not want to put any questions — Mr. Wolf: If your Honor please, I want to except to the remarks of the District Attorney on the ground that they are wholly improper.   If he has any questions to put it is his duty to put them without passing on them.   The Court: Yes.   Q. Mr. Blanck, did you on or about the 25th day of March in the year 1911 commit the crime of manslaughter upon one Rose Grasso?   A. No, sir. Mr. Wolf: I object to the question, if your Honor please, as incompetent, irrelevant and immaterial, and prejudicial.   The Court: The witness may be asked on cross-examination whether he has committed a crime or not.   Mr. Wolf: Whether he has committed a crime?   The Court: Certainly.   Mr. Wolf: I except. The Court: Committed or convicted of.   Mr. Wolf: I except. Q. Did you on the 25th day of March in the year 1911, in the Borough of Manhattan, commit the crime of manslaughter upon one Meyer Utah?   Mr. Wolf: I object on the ground that it is incompetent, irrelevant and immaterial, the only effect of it is to prejudice this jury.   The Court: Unless the District Attorney has evidence to that effect and knows it is so, it is improper. Of course, gentlemen, I need not say that the question is not evidence.   If it is denied by the witness there is no evidence of anything contained in the question.''

Later on the assistant district attorney was called to the witness stand by the defendant's counsel and admitted that the manslaughter cases to which he referred in his cross-examination of the defendant were the cases which arose out of the Triangle Waist Fire in 1910; that he did not make any personal investigation of the facts but that from the knowledge which he gained from the records of his office he knew, when he put the questions, that the defendant had been acquitted in those cases.

The sole effect of addressing these improper questions to the defendant was to create a prejudice against him in the minds of the jurors, as indicating that he had been guilty of arson or manslaughter, though he had never been convicted of either and

though the prosecutor knew he had been acquitted of the latter crime. The learned trial court sought to remove the effect of the questions by a very fair and complete charge on the point, but it is doubtful whether the harm caused by the insinuations contained in such questions can ever be completely cured.

The judgment of conviction should be reversed and a new trial ordered.

CLARKE, P. J., MERRELL, McAVOY and BURR, JJ., concur.

Judgment reversed and new trial ordered. Settle order on notice.